## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Scott Friedenreich, being duly sworn under oath and deposed, state the following:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since December 2008. I am currently assigned to the Philadelphia Field Office where I work on the Violent Crimes Task Force ("VCTF").  I investigate crimes such as commercial robberies and burglaries, carjackings, interstate transportation of stolen property and other violations of federal law.  Before being assigned to the VCTF, I was assigned to the Health Care Fraud Task Force for nine years.  I have written, sworn to, and executed numerous criminal complaints and search warrant affidavits. I have directed cooperating witnesses to conduct consensual recordings and assisted other investigators in consensual recordings.  I have testified in grand jury and federal trials.  During the course of my investigations, I have subpoenaed and analyzed telephone toll and subscriber records and obtained historical cell site data that was used as evidence in my investigations.  I have conducted physical surveillance and participated in investigations when electronic tracking devices were utilized.  Before my employment at the FBI, I was a state of Delaware Probation and Parole Officer for approximately six years.

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – including electronic devices – which are currently in law enforcement possession, for the information described in Attachment B to the warrant.  The properties to be searched are as follows:

a.      A black LG cell phone with a cracked screen and no visible identifying numbers, currently in the possession of the FBI Philadelphia Division and assigned evidence item number 1B6 in case 9E-PH-3446853;

b.      A white/rose gold Apple iPhone SE, model A1662, IMEI 356603081149206, currently in the possession of the FBI Philadelphia Division and assigned evidence item number 1B7 in case 9E-PH-3446853;

c.      A black and orange Chaps suitcase, currently in the possession of the FBI Philadelphia Division and assigned evidence item number 1B9 in case 9E-PH-3446853; and

d.      A gray Concourse suitcase with a broken handle, currently in the possession of the FBI Philadelphia Division and assigned evidence item number 1B10 in case 9E-PH-3446853.

3.      Regarding the two suitcases, the applied-for warrant would authorize the forensic examination of items in the suitcases for the purpose of identifying electronically stored data particularly described in Attachment B to the warrant.

## PROBABLE CAUSE

4.      Based on the facts set forth in this affidavit, there is probable cause to believe that DAVIT DAVITASHVILI has violated Title 18, United States Code, Section 875(c) (threatening communications in interstate or foreign commerce).  As explained more fully below, DAVITASHVILI has made threats to injure and/or kill his estranged wife and as many as 15 others, and transmitted those threats in interstate or foreign commerce by using, among other means, the internet based messaging application Viber.

5.      This affidavit is based upon my personal knowledge, experience and investigation, as well as information related to me directly or through reports of other FBI agents and task force officers and Philadelphia Police Department (PPD) personnel.  Throughout this affidavit, reference will be made to "agents," referring to those federal, state and local law

enforcement officers who have directly participated in the investigation, and with whom I have had regular contact.

6.      Because this affidavit is submitted for the limited purpose of obtaining a search warrant, I have not included all information known by me or other agents concerning this investigation.  I have set forth only those facts I believe are essential to establish probable cause for the search warrant.  This affidavit does not exhaust my knowledge or that of other agents of the facts and circumstances surrounding this investigation.

7.      DAVIT DAVITASHVILI is a naturalized United States citizen, who is originally from the Republic of Georgia ("Georgia").  In August 2016, DAVITASHVILI married Victim 1. DAVITASHVILI and Victim 1 resided together in Philadelphia, Pennsylvania.

8.      According to Victim 1[1], during the course of their marriage DAVITASHVILI was verbally and physically abusive to her.  Victim 1 stated that DAVITASHVILI was a professional fighter, and would hit her in parts of her body where marks would not be visible to others. DAVITASHVILI told Victim 1 that he could kill her with one strike of his hand or foot. DAVITASHVILI also said he "has a gun" for Victim 1 and stated he would disfigure her face with acid or a knife.[2]  Victim 1 also stated that, in approximately October 2019,

---

[1] Victim 1 is a person who is known to me and has been interviewed by law enforcement in connection with this investigation.  Victim 1 is providing information to law enforcement due to concerns about her safety and is not receiving financial or judicial consideration for her information.  Information provided by Victim 1 has been corroborated by this investigation and I believe her to be credible.

[2] I have been unable to locate any evidence that DAVITASHVILI has a firearm legally registered to him in the United States.

DAVITASHVILI raped Victim 1.  Shortly thereafter, Victim 1 moved out and demanded a divorce.[3]

9.      On or about November 5, 2019, DAVITASHVILI left Philadelphia and returned to his native country, Georgia.  DAVITASHVILI did not return to the United States until June 2, 2021.  At all times between DAVITASHVILI's departure to Georgia and the present, Victim 1 has resided in Philadelphia, Pennsylvania, in the Eastern District of Pennsylvania.

10.      After DAVITASHVILI left the United States, he communicated with Victim 1 verbally and in written messages (using communication applications such as Viber and Facebook Messenger).[4]  According to Victim 1, during some of their verbal communications, DAVITASHVILI threatened to kill her and stated that he had a list of people he would kill when he came back to the United States.  Victim 1 also stated that DAVITASHVILI repeated some of these threats in their written communications.

11.      On May 12, 2021, Victim 1 filed a complaint with the FBI regarding DAVITASHVILI, warning that DAVITASHVILI was returning to the United States and had threatened to kill multiple people.   Victim 1 learned from family and an acquaintance that DAVITASHVILI was traveling back to the United States and would arrive on June 2, 2021.  Agents interviewed Victim 1 multiple times and she provided copies of written communications

---

[3] Victim 1 did not report DAVITASHVILI's physical abuse or the rape to law enforcement at the time the incidents occurred.  Victim 1 stated she was afraid DAVITASHVILI would not be incarcerated and would come back to kill her.  Victim 1 stated that, following the rape, she was prepared to contact law enforcement, but that members of DAVITASHVILI's family in Georgia asked her not to and stated they would bring him back to Georgia.  On May 14, 2021, Victim 1 filed a complaint with the Philadelphia Police Department regarding the rape.  On May 19, 2021, Victim 1 obtained a protection from abuse order against DAVITASHVILI.

[4] Based on my training and experience, I am aware that Viber and Facebook Messenger are both messaging applications that allow the user to send and receive audio calls, video calls, written messages, photos and videos.

between her and DAVITASHVILI through Viber and Facebook Messenger.  Those messages are

written in Russian.  Russian-speaking FBI language specialists have reviewed those messages

with agents and, in some cases, prepared translations of the messages.  The following is a

translation of a series of messages dated May 10, 2020, between DAVITASHVILI and Victim 1,

which were transmitted through the internet using Viber ("DD" is DAVITASHVILI and "V1" is

Victim 1):[5]

> DD:      I don't give a fuck about anything. You are wrong about me. When am I
>
> going to begin?! Everything will end then. Whore, I don't give a fuck
>
> even if there is FBI behind you.[6] I AM GOING TO FUCK YOUR
>
> MOTHER. I HAVE NOTHING TO LOSE....THEY ARE GOING TO
>
> SEE THAT SOON. WHORE. IF ANYONE APPROACHES, ONLY
>
> DEATH COULD STOP ME. BEFORE THAT I DON'T GIVE A FUCK.
>
> GO AHEAD, WHORE, CONFESS, UNTIL THEN YOU ARE GOING
>
> TO BE THE WORST SLUT. I DON'T HAVE ANYTHING TO LOSE
>
> ANYMORE. FUCK ALL SYSTEMS, LET ME BE A VICTIM.

---

[5] According to Victim 1, DAVITASHVILI's native language is Georgian and Victim 1's native
language is Ukrainian.  DAVITASHVILI and Victim 1 communicated in Russian, which is a
language they both understand.  The FBI language specialists have informed me that
DAVITASHVILI's writings in Russian are not always grammatically correct and his word
choices sometimes are confusing given the context of the communication, such that translating
certain words or messages is difficult.  In this affidavit, I have indicated areas where the
language specialists were uncertain of the translation by placing the words in *[italicized
brackets]*.  In addition, per FBI policy, the language specialists attempt to write their translations
using proper grammar, even if the original text uses incorrect grammar.  Therefore, the
translations may use commas or other items of punctuation that do not appear in the original
messages.

[6] DAVITASHVILI made this reference before Victim 1 contacted the FBI.

DD:      **You have two choices: either admit to everything. The second one is a wheelchair.** (emphasis added)  Make a choice, you whore, together with your associates who are soon going to suck my hahaha

V1:      I didn't do anything to you, but you did to me.

DD:      You're in the U.S. slut.  When you realize this, it will be too late.

V1:      I could have put you in jail a long time ago and you know it.

V1:      You've got to understand that I am not in Georgia.

V1:      I cannot talk to you as with a normal human being.

DD:      I am not going to end my life as Jeffrey Epstein. I am going to respond to you even if it will cost me my whole life!!!![7]

DD:      You would be sucking my dick until you *[stopped]*[8] breathing, slut. Khatuna knew who you were. So shut your stinky mouth, slut. And lay low.

V1:      Are you continuing to threaten me?

V1:      That I will be in a wheelchair?

V1:      I am going to file a report against you right now. And we'll see what kind of a hero you're going to be before the policemen.

---

[7] Based on my training and experience, my involvement in this investigation, and the context of DAVITASHVILI and Victim 1's conversations, I believe DAVITASHVILI's statement that he is "not going to end my life as Jeffrey Epstein" means that he does not plan to commit suicide, but instead plans to harm other people before he dies, even if it results in his death.  I have also been informed by the FBI language specialists that when DAVITASHVILI states "I am going to respond to you even if it will cost me my whole life," the "you" in that sentence is plural, which I believe means he was targeting several people.

[8] According to the FBI language specialists, the actual word DAVITASHVILI used here was "started," but in the context of the conversation, they believe he meant to say "stopped."

DD:      No one knows what awaits, slut. Maybe even worse. Believe me, you will be fucked soon.

V1:      I have plenty of evidence that you are threatening me and that you forced me back then.

V1:      You didn't want to deal with this nicely.

DD:      If I get started?! Trust me, whore. You will not need any evidence. At least you know me. How much I have left. Go and confess to what I saw with my own eyes.  The nice way, before [unknown word] KGB fucked in America.  I swear, cross my heart. And you are going to be there as well…

DD:      Go file for a divorce, and I will figure out the rest on my own, when I am back.

DD:      After everything, you dare to threaten me, whore?! I am not even going to leave your DNA if I want to, you slut.  Will start with Ukraine, whore.[9]

V1:      I am not threatening.

DD:      Me too. We'll see going forward. I am running amok. You will see and hear when I return what is going to happen with such KGB as you, whore. If I don't have enough time to send them all, I will send many who need to be sent, such as cunt Pele and others, in the name of the USA, whore…All I am left with is one life which I wish would end fairly

---

[9] Based on my training and experience, my involvement in this investigation, and the context of the conversations between DAVITASHVILI and Victim 1, I believe DAVITASHVILI's statements regarding not leaving Victim 1's DNA and starting with Ukraine mean that DAVITASHVILI was threatening to kill Victim 1's entire family, starting with her family members in her native country of Ukraine.

when it won't fucking matter. I want everybody to know!!! **I am not going to leave this life just like that, I am going to take some of you with me!!! Minimum five, I swear. I don't know how to gather you all in one place, I am going to take at least 15 of you and will leave this life at peace. I don't know how to get you motherfuckers all together in one place.** (emphasis added) I think after my life is over there will never be a life in the USA as miserable as what you've done to me, whore.

V1:     I have a 7-year-old brother, and he's never done anything bad to you. He is my DNA. Do you want to kill him, too?

DD:     I hope God blesses him with good health. He will never grow up like you, bitches.

DD:     All in all, please leave my life. Go file for a divorce please, free me up, and everything will get better, slut.[10]

---

[10] After these threats on May 10, 2020, DAVITASHVILI and Victim 1 continued to communicate on Viber until the end of May 2020, at which point Victim 1 blocked DAVITASHVILI on Viber.  In June 2020, DAVITASHVILI contacted Victim 1 using Facebook Messenger, and they communicated through that means periodically during June 2020. According to Victim 1, DAVITASHVILI blocked her on Facebook Messenger at the end of June 2020 because she continued to raise the divorce.  Victim 1 and DAVITASHVILI did not communicate for several months after that.  On February 25, 2021, DAVITASHVILI contacted Victim 1 on Facebook Messenger (using a different Facebook account).  According to a translation by the FBI language specialists, DAVITASHVILI's message to Victim 1 on February 25, 2021 stated: "I swear, I will find everybody! Who put you on this road which has become the reason behind our divorce!!! I swear."  Victim 1 replied in April 2021, and she and DAVITASHVILI then communicated periodically in April and May 2021 using Facebook Messenger.

12.     I believe that DAVITASHVILI was the user of the Viber account that sent these messages.  I base my belief on the following factors, among others: (1) Victim 1 showed agents the profile for the account that sent the messages, which indicated that phone number 215-xxx-7882 was associated with the account.[11]  Victim 1 knew this to be a phone number that DAVITASHVILI used before leaving for Georgia; (2) the user of the account conducted audio calls with Victim 1, and Victim 1 recognized DAVITASHVILI's voice during the calls; (3) the communications between the user of the account and Victim 1 frequently related to DAVITASHVILI and Victim 1's marriage; and, (4) Victim 1 recognized the messages as the types of things DAVITASHVILI would say.

13.     While DAVITASHVILI was in Georgia, Victim 1 occasionally communicated in writing with one of his relatives in Georgia using Facebook Messenger.  Those messages are written in Russian.  Russian-speaking FBI language specialists have reviewed those messages with agents and, in some cases, prepared translations of the messages.  In a message dated December 19, 2020, DAVITASHVILI's relative stated: "Dato is not well, going back to America and wants war."  Through my involvement in this investigation, I know "Dato" to be a nickname for DAVITASHVILI.

---

[11] Based on my training and experience, I am aware that Viber requires users to enter a phone number to establish an account.

14.    On December 19, 2020, the relative also stated that DAVITASHVILI was diagnosed with psychosis.[12]  On April 13, 2021, the relative wrote the following to Victim 1:[13] [14]

| | |
|---|---|
| Relative: | Dato is currently better. He hasn't completely recovered, he doesn't trust people, only trusts family members. He speaks about other people in a threatening manner. |
| Relative: | He speaks about other people with suspicion. He is bored, lazy about everything. Lazy about self-care. |
| Relative: | When Dato arrived at the beginning, I was really happy. He was very skinny. Chaotic mind. |
| Relative: | He was admitted to a neurology ward for two weeks. The doctor diagnosed him with severe psychosis. He was also administered injections and medications. The doctor told Dato that smoking is not a plan, and that there are things he can't be doing. |
| Relative: | Dato cannot drink . . . When he's sober he is quiet, when he's drunk he remembers American news and threatens to retaliate. |

[12] Victim 1 and Witness 2 (discussed below) both stated that DAVITASHVILI told them that he received psychiatric treatment while in Georgia.

[13] The messages are written in Russian and have been translated by the FBI language specialists. According to the language specialists, it appears that the relative originally wrote the text in a language other than Russian, then used machine translation (such as Google Translate) to translate it and cut-and-pasted the results into the messages to Victim 1.  As a result, the intended meaning of the source message is sometimes difficult to determine.

[14] In messages on May 12, 2021, the relative denied saying that DAVITASHVILI wanted to start a war in America, and stated DAVITASHVILI did not want to kill anyone. The relative also stated DAVITASHVILI wanted to get a divorce from Victim 1 and did not plan to see Victim 1 in America.  During the same period as the family member denying that he was a threat to Victim 1, DAVITASHVILI was sending messages to Witness 1 with photographs of people he believed were conspiring against him.

15.     On May 31, 2021, agents interviewed Witness 1, who is an acquaintance of DAVITASHVILI in Philadelphia.  Witness 1 knew DAVITASHVILI before his return to Georgia.  Witness 1 stated that, while DAVITASHVILI was in Georgia, he communicated with Witness 1 using Viber.  Witness 1 provided Victim 1 with copies of DAVITASHVILI's Viber communications, which Victim 1 provided to agents.  Those messages are written in Russian. Russian-speaking FBI language specialists have reviewed those messages with agents and, in some cases, prepared translations of the messages.

16.     DAVITASHVILI sent the messages to Witness 1 from two different Viber accounts – one covering the time period of March 17, 2020 to January 5, 2021, and the other covering the time period March 17, 2021 to May 26, 2021.  The latter account was associated with phone number 9xxx98104640 (Georgian phone number).  I believe DAVITASHVILI was the person using this account based on the following factors, among others: (1) In the first series of messages to Witness 1 from this account (on March 17, 2021), the sender identified himself as "Davit from Georgia"; (2) in a message on April 14, 2021, the sender discussed working at an auto body shop in the Philadelphia area (based on information from Victim 1 and wage records, I am aware that DAVITASHVILI previously worked at that auto body shop); and (3) the account used a Georgian phone number, and DAVITASHVILI was in Georgia at the time of the messages.  Agents could not determine the phone number associated with the account that sent the March 2020-January 2021 messages, because the phone number was not listed in the screenshots Witness 1 provided.  I nevertheless believe DAVITASHVILI was the user of this account based on the following factors, among others: (1) In Witness 1's Viber account, he had the user listed as "Davit Davitashvili"; (2) the messages discuss mutual acquaintances of

DAVITASHVILI and Witness 1; and (3) the messages appear to be written by the same person who wrote the messages associated with the 9xxx98104640 account.

17.     On December 10, 2020, DAVITASHVILI wrote to Witness 1, in part: "SO FAR I HAVE BEEN WAITING FOR THESE PEOPLE TO ANSWER FOR THEIR ACTIONS BEFORE THE LAW. IF NOT—I AM GOING TO FIGURE IT OUT ON MY OWN. THAT'S WHY I AM NOT MENTIONING ANY NAMES." Later in the messages, DAVITASHVILI stated, in summary, that he doesn't know who to start with or how many people he could "manage."  DAVITASHVILI added that this is not going to end just like that.  Based on my training and experience, my involvement in this investigation and the context of these messages and others I have reviewed, I believe that when DAVITASHVILI stated that he did not know who to start with or how many people he could "manage," he was saying that he did not know who he would attack first or how many people he would be able to attack.

18.     Between March 22, 2021 and May 26, 2021, DAVITASHVILI sent Witness 1 the names and/or photographs of more than a dozen people.  In some cases, DAVITASHVILI provided a description of the people and/or grievances he has against them.  Based on my training and experience, my involvement in this investigation and my review of the messages, in summary it appears that DAVITASHVILI believes that some or all of the people are involved in an undefined conspiracy targeted against DAVITASHVILI, for unspecified reasons.  In the messages, DAVITASHVILI appears to express frustration that authorities are not investigating this.  In a message dated May 9, 2021, DAVITASHVILI expressed frustration that his

allegations were not being looked at, and asked "Is it really necessary for me to punish somebody severely?"[15]

19.     Witness 1 stated that in his opinion the messages were basically incoherent ramblings.  Witness 1 described DAVITASHVILI as having schizophrenic tendencies and stated he had a short temper and would become aggressive easily.  Witness 1 stated DAVITASHVILI was a mixed martial arts fighter and was a strong, tough person.  Based on his knowledge of DAVITASHVILI and the Viber messages DAVITASHVILI sent to Witness 1, Witness 1 believes DAVITASHVILI intends to hurt someone.

20.     On May 31, 2021, agents interviewed Witness 2, who is an acquaintance of DAVITASHVILI in Philadelphia.  Witness 2 knew DAVITASHVILI before his return to Georgia.  Witness 2 described DAVITASHVILI as a paranoid and aggressive person, who frequently thought people were acting against him.  Witness 2 spoke to DAVITASHVILI at some point after DAVITASHVILI received psychiatric treatment in Georgia.  Witness 2 stated DAVITASHVILI expressed a desire to return to Philadelphia and sounded fine for approximately 20 minutes, until he ranted about finding the people who harmed him to fix them.  Witness 2 understood this to mean that DAVITASHVILI wanted to kill those people.  Witness 2 also stated that after DAVITASHVILI went to Georgia, DAVITASHVILI asked Witness 2 to gather information about Victim 1, such as where she was living, where she was working and what car she was driving.

---

[15] In one of the messages, DAVITASHVILI discussed his former boss at an auto body shop in Pennsylvania. In other messages, DAVITASHVILI described a man who allegedly lived in Philadelphia and another man who allegedly lived in New York City.  Agents have not yet fully identified those people.  Agents currently believe that the remaining people DAVITASHVILI listed in the messages are located overseas.

21.     I believe that, at the time of the threatening communications to Victim 1 described above, DAVITASHVILI was located outside of the United States.  Agents have obtained records and information from the United States Customs and Border Protection, which indicate that DAVITASHVILI left the United States on November 5, 2019, and did not return to the United States until June 2, 2021.

22.     On June 2, 2021, agents obtained a criminal complaint in the Eastern District of Pennsylvania, charging DAVITASHVILI with a violation of Title 18, United States Code, Section 875(c) (threatening communications in interstate or foreign commerce).  Later that day, agents arrested DAVITASHVILI at John F. Kennedy International Airport in New York City, New York, shortly after he walked off of a plane that had just landed in the United States.[16]  At the time of his arrest, DAVITASHVILI had the following items on his person, among others: a black LG cell phone with a cracked screen and no visible identifying numbers, and a gray Adidas duffel bag.  Agents subsequently conducted a search incident to arrest and inventory search of the duffel bag.  One of the items located in the bag was a white/rose gold Apple iPhone SE, model A1662, IMEI 356603081149206.  Agents also collected DAVITASHVILI's checked luggage, which consisted of two suitcases: a black and orange Chaps suitcase, and a gray Concourse suitcase with a broken handle.  All of these items were later entered into evidence at the FBI Philadelphia Division.

23.     Following his arrest, DAVITASHVILI was transported to an FBI office in New York, where agents explained the charges and advised DAVITASHVILI of his *Miranda* rights.

---

[16] DAVITASHVILI arrived in the United States on a Qatar Airways flight from Doha, Qatar. DAVITASHVILI's travel originated in Tbilisi, Georgia, with a connecting flight in Doha.

DAVITASHVILI waived his rights and agreed to speak with agents.[17]  DAVITASHVILI was interviewed by agents for approximately 10 minutes, then stated he wanted to speak with a lawyer.  At that point, agents ended the interview.  Agents spent an additional approximately 1 hour 45 minutes with DAVITASHVILI in order to, among other things, serve him with a protection from abuse order Victim 1 obtained against him; process him by obtaining fingerprints, photographs, a DNA sample and biographical information; inventory the items in his possession at the time of his arrest; and allow him to attempt to contact relatives in Georgia to inform them of his arrest.  During that time, DAVITASHVILI sometimes made unprompted statements, despite agents telling DAVITASHVILI that they did not want to speak with him regarding those matters because he had invoked his right to counsel.

24.     Regarding the items that are the subject of the applied-for search warrant, DAVITASHVILI provided the following information during his post-*Miranda* interview and his unprompted statements:

a.     When DAVITASHVILI left the United States, he had a cell phone.  That phone later broke, and he got a black LG cell phone in Georgia (which is the phone that was in DAVITASHVILI's possession at the time of his arrest and is described in Attachment A).  Agents asked if DAVITASHVILI transferred the contacts and other data to the new phone.  DAVITASHVILI stated he had contacts in a different phone and in an iPhone in his carry-on bag (which agents identified as the white/rose gold Apple iPhone that is described in

---

[17] During the interactions between agents and DAVITASHVILI, he sometimes spoke English and sometimes spoke Georgian.  Agents were accompanied by a Georgian-speaking FBI language specialist, who interpreted when necessary.  The *Miranda* warnings were provided in English and interpreted into Georgian.  DAVITASHVILI was also provided with a copy of the advice of rights form that was written in Georgian, which he read and signed.

Attachment A).  As discussed in the next paragraph, I believe the other phone

DAVITASHVILI referred to is located in one of his suitcases.

b.  DAVITASHVILI stated he had a phone in his checked luggage (i.e., one of

the two suitcases), which was out of power and needed to be charged.

DAVITASHVILI stated the phone in his checked luggage had a screen that

was half-broken, so he only used the phone to obtain his contacts.

DAVITASHVILI referred to this phone because he stated he needed to obtain

a phone number from it.  DAVITASHVILI stated he was planning to take a

taxi from the airport in New York to Philadelphia and find a cheap hotel for

the night.  The next day, he planned to obtain a job by contacting a person he

knew in the Philadelphia area who owned a construction business.  That

person, who DAVITASHVILI only knew by first name, was his former boss

from an auto body shop.  DAVITASHVILI stated he had that person's phone

number in the phone in his checked luggage.[18]

c.  DAVITASHVILI made an unprompted statement that when he tried to talk to

Victim 1 regarding money, she only wanted to communicate via text, instead

of speaking verbally.  Later, also unprompted, DAVITASHVILI pointed to

---

[18] While conducting an inventory of DAVITASHVILI's carry-on bag (the gray Adidas duffel bag), an agent located the white/rose gold Apple iPhone and asked DAVITASHVILI if it was the phone in his baggage to which he previously referred, and DAVITASHVILI stated yes. However, I believe DAVITASHVILI did not understand what the agent was asking. DAVITASHVILI described the phone in his checked baggage as having a half-broken screen and being out of power.  The white/rose gold Apple iPhone in DAVITASHVILI's carry-on bag did not have a broken screen, and it had power.  Therefore, I believe it is likely that there is at least one additional cell phone in DAVITASHVILI's suitcases.

the black LG cell phone and stated that the phone contained text messages he
sent to his wife.  DAVITASHVILI stated he needed those texts for court.

    d.    At DAVITASHVILI's request, agents used Facebook Messenger on the black
LG cell phone to attempt a phone call to his sister and to send a text message
to his uncle, in order to inform them of DAVITASHVILI's arrest.

25.    A criminal history check for DAVITASHVILI revealed that, in 2006, he was
arrested in New Jersey for stalking and simple assault.  He was convicted of the simple assault
charge in 2007.  Agents have reviewed police paperwork from this case, which revealed that the
victim was DAVITASHVILI's ex-girlfriend.  In addition, in 2012 DAVITASHVILI was charged
with indecent exposure and related charges in Philadelphia.  The PPD paperwork from the case
reveals that DAVITASHVILI, while driving his car, exposed his penis to a pedestrian and
ordered her to get into his car.  DAVITASHVILI was identified based on the license plate of the
car, and the victim's identification of him from a photo array.  Agents have reviewed the court
docket sheet for the case, which showed that the case was withdrawn when the victim failed to
appear in court.

26.    Based on my training and experience, I know that evidence of a crime can often
be found in a subject's personal property, such as electronic devices and documents and records
that identify victims, associates, co-conspirators and accomplices (such as photographs, address
books, ledgers and papers with names and numbers); and travel records and financial records,
including bank account statements and credit card information.  In this case, such records are
relevant to establish that DAVITASHVILI made the threatening communications; his location
when he made the threatening communications; the identities of his intended victims; and his

intent to carry out the threats, including whether he searched for or acquired information about the intended victims' locations, places of employment, or vehicles.

27.     Based on my training and experience, I know that people who commit violent crimes often use weapons, such as knives and firearms, in the commission of the offense.   In the threats described above, DAVITASHVILI discussed his desire to kill up to 15 people in one place.   Based on my training and experience, such an act would likely be committed using a weapon, such as a firearm or knife.[19]   I am also aware that people who commit violent crimes often must restrain, gag and/or muffle their victims to prevent them from escaping or attracting the attention of passersby.   To accomplish this, offenders use items such as handcuffs, zip ties, rope, cables, duct tape, hoods and gags.   I am also aware that people who commit violent crimes often take measures to conceal their identity and avoid leaving fingerprints or DNA during their offenses, including by wearing masks, gloves, hats, hoods and disguises.

28.     Based on my training and experience, as well as the training and experience of other agents, a wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used primarily for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include, but are not limited to:

---

[19] I am aware that DAVITASHVILI would have undergone security screening before boarding his flight, which would make it less likely that his luggage would contain weapons.  However, his suitcases and/or electronic devices may contain references to any weapons DAVITASHVILI possessed elsewhere or was attempting to acquire.

storing names and phone numbers in electronic "address books;" sending, receiving, and storing

email, voice messages and text messages;[20] taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing dates, appointments,

and other information on personal calendars; and accessing and downloading information from

the Internet.  Wireless telephones may also include global positioning system ("GPS")

technology for determining the location of the device and for mapping and navigation features.  I

am also aware that computers and tablets possess many of the same features as wireless

telephones, with a larger storage capacity and additional capabilities.  Based on my training and

experience, I am aware that people who engage in violent crimes have been known to use some

or all of these features of electronic devices in furtherance of their illegal activities.  In this case,

the threatening communications were made via messaging applications, which require and

electronic device such as a cell phone, tablet or computer.

     29.    Further, I am aware that people who engage in violent crimes will often use the

Internet (including on their cell phones, tablets and computers) to search for information about

their intended victims (such as their name, address, place of employment, phone number,

photograph and social media presence), directions and other information.  Further, I am aware

that people who engage in violent crimes may possess photographs (including in their phones) of

themselves; their victims; clothing worn during the offenses; weapons and other items used

during the offenses; and the locations where the offenses occurred.  These photos are often

---

[20] Based on my training and experience, I am aware that, among the services commonly offered
by wireless phone providers is the capacity to send short text or multimedia messages (photos,
audio, or video) from one subscriber's phone or wireless device to another phone or wireless
device via one or more wireless providers. This service is often referred to as "Short Message
Service" ("SMS") or "Multimedia Messaging Service" ("MMS") (or, in the case of Apple
iPhones, "iMessages"), and is often referred to generically as "text messaging" or "wireless
messaging" (collectively referred to in this affidavit as "text messages").

shared via text message, email or social media.  I also know from my training and experience

that criminals often have multiple phones to facilitate their commission of illegal activities while

attempting to thwart identification by law enforcement through the use of multiple phones or

"burner" phones which cannot be traced back to an individual.  This same rationale holds true for

social media accounts - criminals often maintain multiple accounts, and often use fake names

associated with those accounts.

30.     Based on my training and experience, I am aware that people who commit violent

crimes and/or make threatening communications often commit such offenses numerous times

before being caught for the first time.  In this case, Victim 1 stated that DAVITASHVILI

threatened her many times verbally and physically, before sending the threatening messages.  In

addition, DAVITASHVILI also sent messages to Witness 1 and made statements to Witness 2

that, I believe, were threats to injure or kill others.  Therefore, I believe it is likely that

DAVITASHVILI has made other threatening communications in the past.  As such, this warrant

seeks permission to search for evidence of threatening communications in addition to the

offenses against Victim 1.

31.     Based on the above, I believe probable cause exists that DAVITASHVILI, while

outside of the Eastern District of Pennsylvania, transmitted communications containing threats to

injure and/or kill Victim 1, who was inside of the Eastern District of Pennsylvania, and others, in

violation of 18 U.S.C. § 875(c).   I also believe there is probable cause to search the items listed

in Attachment A to the warrant for the information listed in Attachment B.

## TECHNICAL TERMS

32.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

a.      Wireless telephone:  See paragraph 28.

b.      Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or

locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include GPS technology for determining the location of the device.

     f.     Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Internet, sending and receiving e-mail, and participating in Internet social networks.

     g.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

33.    Based on my training, experience, and research, I know that the electronic devices listed in Attachment A have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, a PDA, and/or a tablet, and that allow their users to access the Internet.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used a device, motive, and whether a criminal used the Internet and/or GPS navigation to commit his crimes.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the

Internet are typically stored for some period of time on a device. This information can

sometimes be recovered with forensic tools.

     35.     There is probable cause to believe that things that were once stored on the

electronic devices listed in Attachment A may still be stored there, for at least the following

reasons:

     a.     Based on my knowledge, training, and experience, I know that computer files

or remnants of such files can be recovered months or even years after they

have been downloaded onto a storage medium, deleted, or viewed via the

Internet. Electronic files downloaded to a storage medium can be stored for

years at little or no cost. Even when files have been deleted, they can be

recovered months or years later using forensic tools. This is so because when

a person "deletes" a file on a computer, the data contained in the file does not

actually disappear; rather, that data remains on the storage medium until it is

overwritten by new data.

     b.     Therefore, deleted files, or remnants of deleted files, may reside in free space

or slack space-that is, in space on the storage medium that is not currently

being used by an active file-for long periods of time before they are

overwritten. In addition, a computer's operating system may also keep a

record of deleted data in a "swap" or "recovery" file.

     c.     Wholly apart from user-generated files, computer storage media-in particular,

computers' internal hard drives-contain electronic evidence of how a

computer has been used, what it has been used for, and who has used it. To

give a few examples, this forensic evidence can take the form of operating

system configurations, artifacts from operating system or application

operation, file system data structures, and virtual memory "swap" or paging

files.  Computer users typically do not erase or delete this evidence, because

special software is typically required for that task.  However, it is technically

possible to delete this information.

    d.    Similarly, files that have been viewed via the Internet are sometimes

automatically downloaded into a temporary Internet directory or "cache."

    e.    Based on my training and experience, I am aware that cell phones and tablets

operate in a similar manner to computers, and items that were previously

deleted from cell phones or tablets may be similarly be recovered from those

devices.

36.    *Forensic evidence.*  As further described in Attachment B, this application seeks

permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described in the warrant, but also forensic evidence that establishes how

the electronic devices listed in Attachment A were used, the purpose of their use, who used them,

and when.  There is probable cause to believe that this forensic electronic evidence might be on

the devices because:

    a.    Data on the storage medium can provide evidence of a file that was once on

the storage medium but has since been deleted or edited, or of a deleted

portion of a file (such as a paragraph that has been deleted from a word

processing file).  With respect to laptops, virtual memory paging systems can

leave traces of information on the storage medium that show what tasks and

processes were recently active.  Web browsers, e-mail programs, and chat

programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.       Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.       A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.       The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.     I know that when an individual uses an electronic device to commit a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

37.     *Nature of examination*.  With respect to the electronic devices described in Attachment A to the search warrant, searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases; however, such techniques may not yield the evidence described in the warrant.  Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning

storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In addition, I expect most, if not all, of the information in the electronic devices to be in a foreign language, which will require a language specialist to assist and/or translate the information.  In light of these difficulties, and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant I am applying for would permit the examination of the electronic devices using whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

38.     *Manner of execution.*  Because this warrant seeks only permission to examine property (including electronic devices) already in law enforcement's possession, the execution of the warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is good cause for the Court to authorize execution of the warrant at any time in the day or night.

39.     Based on the above, I believe that probable cause exists that DAVIT DAVITASHVILI has committed violations of 18 U.S.C. § 875(c) (threatening communications in interstate or foreign commerce), and that evidence of these violations (as described in Attachment B) exists in the places to be searched (as described in Attachment A).

*Scott Friedenreich*
SCOTT FRIEDENREICH
Special Agent
Federal Bureau of Investigation

Sworn to before me
this _22nd___ day of June 2021

_____*Timothy R. Rice*_____
HONORABLE TIMOTHY R. RICE
*United States Magistrate Judge*

## ATTACHMENT A

1.      The property to be searched is as follows:

      a.      A black LG cell phone with a cracked screen and no visible identifying numbers, currently in the possession of the FBI Philadelphia Division and assigned evidence item number 1B6 in case 9E-PH-3446853;

      b.      A white/rose gold Apple iPhone SE, model A1662, IMEI 356603081149206, currently in the possession of the FBI Philadelphia Division and assigned evidence item number 1B7 in case 9E-PH-3446853;

      c.      A black and orange Chaps suitcase, currently in the possession of the FBI Philadelphia Division and assigned evidence item number 1B9 in case 9E-PH-3446853;

      d.      A gray Concourse suitcase with a broken handle, currently in the possession of the FBI Philadelphia Division and assigned evidence item number 1B10 in case 9E-PH-3446853; and

      e.      Any additional electronic devices located within the above items, including cell phones, tablets, computers, USB drives and other removable storage media.

This warrant authorizes the forensic examination of the aforementioned electronic devices for the purpose of identifying electronically stored information described in Attachment B.

## ATTACHMENT B

1.      Weapons, including knives, firearms and ammunition, and any records (including in electronic form) regarding the ownership, possession, acquisition or attempted acquisition of such items.

2.      Items used to restrain people, including handcuffs, zip ties, rope, cables, duct tape, hoods and gags.

3.      Gloves, hats, masks, hoods, disguises, or any other clothing that could be worn to hide one's identity during the commission of a violent crime.

4.      All records, including records on the electronic devices described in Attachment A, that relate to threats to injure the person of another (18 U.S.C. § 875(c)), including:

   a.   Documents, in whatever form (including correspondence, photos, videos, address books, calendars, opened or unopened emails, text messages, social media messages, voicemail messages, call logs, chat logs, Internet history, GPS data and map history), regarding threats to injure the person of another, including documents relating to the intended victims (including photographs, public records checks and identification documents); documents relating to any associates, coconspirators or accomplices; and documents relating to the reason, motive or intent for committing the offenses (including photographs, address books, ledgers and papers with names and numbers).

   b.   All records that show whether and how DAVIT DAVITASHVILI used the Internet, GPS or mapping data to send threats or research the targets of threats.

   c.   Photographs and videos relating to targets of DAVITASHVILI's threats, including photographs and videos of Victim 1.

   d.   Records regarding any acts of physical violence (including sexual assault) DAVITASHVILI has committed or intended to commit against any person, including Victim 1.

   e.   Documents regarding DAVITASHVILI's mental health.

   f.   Address books and calendars.

g. Travel records and financial records, including but not limited to receipts reflecting the purchase of items, bank statements and credit card statements, and specifically records regarding DAVITASHVILI's travel and/or location during the time period of November 2019 through June 2021.

h. Documentation concerning the use of the mails or interstate wires relating to the items sought above, including, but not limited to: letters, forms, notes, facsimiles, electronic messages such as e-mails/text messages/social media messages, pamphlets, invoices, mailing or federal express receipts, and remittances.

5.      Evidence of user attribution showing who used or owned the electronic devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records," "documents" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.